**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **JANE DOE (MH),** | |
| **PLAINTIFF** | |
| **V.** | |
| | **CIVIL ACTION NO.  4:22-cv-198** |
| **G6  HOSPITALITY  LLC;  G6 HOSPITALITY IP, LLC;  G6 HOSPITALITY PROPERTY, LLC; G6 HOSPITALITY PURCHASING, LLC; AND MOTEL 6 OPERATING LP,** | |
| **DEFENDANTS.** | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now, Jane Doe (MH) Plaintiff in the above-styled and numbered cause, and files this her First Amended Complaint complaining of G6 Hospitality, LLC d/b/a Motel 6; G6 Hospitality IP, LLC; G6 Hospitality Property, LLC; G6 Hospitality Purchasing, LLC; and Motel 6 Operating, LP (hereinafter collectively referred to as "G6" or "Motel 6"), as Defendants, and would respectfully shows the Court and jury as follows:

### I.      Summary of the Case Against G6

1.      Jane Doe (MH) files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of sex trafficking. G6 owns and operates hotels under the names of Motel 6 and Studio 6. Plaintiff alleges that the G6 Defendants knowingly benefitted financially from participation in a venture when G6 knew and/or or should have known the venture was engaged

1

in trafficking in violation of 18 U.S.C. § 1595.

2.      Human sex trafficking is a pervasive evil that has left an indelible stain on the fabric of society. This conduct is undoubtedly one of the most wicked and immoral forms of behavior to plague civilized societies.

3.      As sex trafficking has grown to epidemic proportions, it has become widely recognized that our laws must look beyond the direct trafficker and sex buyer to end sex trafficking.

4.      Congress thereby enacted the Trafficking Victims Protection Reauthorization Act and its reauthorization amendments ("TVPRA").[1] These statutes expanded civil liability beyond the direct individual traffickers to provide a civil remedy for trafficking victims against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known" was engaged in trafficking.[2]

5.      This case is about the continuous sex trafficking of Jane Doe (MH). Jane Doe (MH) was the unfortunate victim of a scheme that began with criminal traffickers, but was assisted, supported, and/or facilitated by G6 and its associates.

6.      Hotels exist to make profits, and trafficking increases revenues for any facility willing to tolerate this depraved behavior. Traffickers know that some hotels rarely intervene even in the face of openly illegal behavior. The industry and its component members must be held accountable for their role in the expansion of sex trafficking in the United States.

---

[1] 18 U.S.C. Chapter 77; *see generally* United States Department of Justice, Human Trafficking-Key Legislation (Jan. 6, 2017), link at Human Trafficking-Key Legislation.
[2] 18 U.S.C. § 1591.

7.      Each of the Defendants named in this lawsuit violated federal law by obtaining financial and other benefits as a result of participating in a venture they knew or should have known was engaged in a trafficking venture.

8.      Thwarting the expansive growth of human trafficking requires society to hold accountable those who knowingly profit from participation in ventures that a reasonable person knew or should know was engaged in various forms of human slavery. Thus, civil lawsuits are an essential component of a viable plan for combatting sex trafficking in America.

## II.      Jurisdiction and Venue

9.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States, including the collective Trafficking Victims Protection Reauthorization Acts ("TRVPA"), 18 U.S.C. Chapter 77, specifically 18 U.S.C. §1595.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants resides in this district, and a substantial part of the events and/or omissions giving rise to this claim occurred in this District and Division.

## III.      PARTIES

11.     Jane Doe (MH) currently resides in California. She was a victim of sex trafficking, which took place at a Motel 6 at 2330 West Bell Road, Phoenix, Arizona 85023 during the time period June, July, and August of 2012.  Given the nature of these allegations, and in reliance on Texas law that permits use of a pseudonym, this complaint identifies your Plaintiff as "Jane Doe (MH)" throughout. Jane Doe (MH) may be contacted through her lead counsel, whose information is contained below.

12.      Defendant G6 Hospitality LLC is a Delaware limited liability company with its headquarters at 4001 International Parkway, Carrollton, Texas.  G6 Hospitality LLC may be served with this lawsuit by serving its registered agent:  Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

13.      G6 Hospitality IP, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas. Defendant G6 Hospitality IP, LLC may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

14.      G6 Hospitality Property, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas. Defendant G6 Hospitality Property, LLC may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

15.      G6 Hospitality Purchasing, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas. Defendant G6 Hospitality Purchasing, LLC may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

16.      Motel 6 Operating LP is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas. Defendant Motel 6 Operating LP may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

## IV.    **Preliminary Matters**

17.      All conditions precedent to the filing of this lawsuit have been performed or have occurred. Fed. R. Civ. P. 9 (c).

18.     This pleading references numerous statutes, regulations, and official documents and acts. In all instances cited in this pleading, the document was legally issued, or the act legally done. Fed. R. Civ. P. 9 (d).

19.     Special damages are sought in this lawsuit and are described with more particularity in this Complaint. Fed. R. Civ. P. 9 (g).

## V.      Sex Trafficking

20.     Sex trafficking is the use of force, fraud, or coercion to compel an individual to engage in commercial sex acts.  Exploitation of a minor for commercial sex is human trafficking regardless of whether any form of force, fraud, or coercion was used.[3]

21.     Sex trafficking is a serious public health problem that negatively affects the well-being of individuals, families, and communities.[4]

22.     There is a well-recognized intersection at which criminal human traffickers intersect with mainstream "chamber of commerce" businesses that facilitate and profit from the underlying criminal venture.  Hence, human trafficking is accurately characterized as a criminal venture that depends on mainstream business partners to flourish.[5]

23.     Criminal human traffickers recognize that the success of their enterprises often depends on their association with or use of otherwise legitimate businesses.

## VI.      The Role of the Hospitality Industry in Sex Trafficking

---

[3] The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3). "Coercion" is defined in § 1591(e)(2). *See generally* United States Department of Justice, What is Human Trafficking? link at What is Human Trafficking?  Sex trafficking is formally defined by the Trafficking Victims Protection Act of 2000 as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."  https://www.congress.gov/bill/106th- congress/house-bill/3244 See generally United States Centers for Disease Control and Prevention, Sex Trafficking (2021), link        at https://www.cdc.gov/violenceprevention/sexualviolence/trafficking.html#:~:text=Sex%20trafficking%20is%20defin ed%20by,adult%20engage%20in%20commercial%20sex
[4] United States Centers for Disease Control and Prevention, Sex Trafficking (2021), link at CDC-Sex Trafficking
[5] *Id.*

24.     Hotels and motels are a crucial piece of the infrastructure necessary to facilitate sex trafficking in America.  Reliable data reveals that over three fourths of all sex trafficking cases\ involve hotels.[6]  These statistics have been known to the hotel and motel industry for  years.

25.     Hotels are used in a variety of other ways by both traffickers and their victims including recruitment and trafficking operations.[7]  Thus, sex trafficking and the sexual exploitation of trafficking victims is a rampant, well-known problem in the hotel industry. [8]

26.     Hotel owners and their staff often have a unique vantage point from which to identify potential human trafficking victims on their properties – as well as the traffickers themselves.[9]  For this reason, hotels and their employees recognize the industry is a focal point for adult and child sex trafficking and have for many years.

27.     Unfortunately, the hospitality industry has long been complicit in the proliferation of sex trafficking.  Despite the prevalence of victimization at hotels, 94% of Polaris survey respondents (victims) disclosed they never received any assistance, concern, or identification from hotel staff.[10]

28.     Hotels permit traffickers to maintain a semblance of privacy that facilitates their crimes, traffickers secrete their victims in publicly accessible venues and impede the victim's ability to escape, all the while making the prey accessible to "Johns" who pay for commercial sex.[11]

---

[6] Polaris, Human Trafficking in the Hotel Industry, link at Human Trafficking and Hotels and Motels.  Polaris is a reputable anti-trafficking organization and manages the US National Human Trafficking Hotline.  Polaris Project
[7] On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking – Hotels and Motels, The Polaris Project, link at On-Ramps, Intersections, and Exit Routes
[8] *See generally* United States Department of Homeland Security, Blue Campaign-Human Trafficking and the Hospitality Industry, link at Human Trafficking and the Hospitality Industry; Forbes, Cracking The $150 Billion Business Of Human Trafficking, link at The $150 Billion Business Of Human Trafficking
[9] *Id.* page 26.
[10] *Id.* page 23.

[11] Human Trafficking and the Hospitality Industry, United States Department of Homeland Security – Blue Campaign, link at Human Trafficking and the Hospitality Industry; see also A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking, The Polaris Project (2020), link at A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking.
[12] Cavagnaro, G. L. C. (2017). Sex trafficking: The hospitality industry's role and responsibility. Available from Cornell University, School of Hotel Administration site: Sex trafficking: The hospitality industry's role and responsibility.

6

29.     Moreover, hotels and motels offer anonymity making hotels a top venue for the crime.[12]  In short, hotels present a desirable scenario for these criminal enterprises.

## VII. <u>Combatting Sex Trafficking</u>

30.     The most effective weapon against sexual exploitation and human trafficking is education and training.[13]  It is important for staff in the hospitality industry to recognize the signs of human trafficking and be prepared to act if they observe a potential human trafficking situation in their establishment.[14]

31.     It is well-recognized that training is critical to stopping trafficking at hotels and motels.  As ECPAT[15]concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property. [16]

32.     There are abundant resources available to the hospitality industry that provide effective trafficking recognition and response training.[17]  Every hotel – large and small, luxury and modest, urban and rural – has the resources to implement a viable anti-trafficking program.

33.     There are virtually unlimited resources available to members of the hospitality industry who seek to implement effective anti-human trafficking polices.  Each of the following organizations offers guidance and recommendations for viable programs in this context:

---

[13] Polaris-Recognizing Human Trafficking.  The first step to combating trafficking is to identify victims so they can be rescued and help bring their perpetrators to justice.  DHS Blue Campaign, Human Trafficking Awareness Training, link at Blue Campaign-Awareness Training

[14] National Human Trafficking Resource Center, Human Trafficking and the Hospitality Industry (2021), link at Human Trafficking and the Hospitality Industry

[15] ECPAT-USA is the leading anti-child trafficking organization in the United States seeking to end the commercial sexual exploitation of children through awareness, advocacy, policy, and legislation. ECPAT-USA is a member of ECPAT International, a network of organizations in more than 100 countries with one common mission: to eliminate the sexual exploitation of children around the world.  https://www.ecpatusa.org/

[16] ECPATUSA-Hotel Training.

[17] Look, listen – and stop!  Staff training to identify human trafficking is the first step toward fighting it (2019), link at Look, listen – and stop!

- United Nations Universal Declaration of Human Rights
- United Nations Global Compact
- United Nations Guiding Principles on Business and Human Rights
- The Code – The Tourism Child-Protection Code of Conduct[18]
- Polaris Project
- National Human Trafficking Resource Center and Hotline
- HHS/ACF Look Beneath the Surface
- BEST - Businesses Ending Slavery & Trafficking
- Sustainable Hospitality Alliance Trafficking Recommendations
- American Hotel Lodging Association Trafficking Recommendations[19]

34.     The leading federal agency in this arena is The United States Department of Homeland Security (DHS) Blue Campaign. The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.[20]

35.     The Blue Campaign recognizes that traffickers have long used the hotel industry for sex trafficking and offers resources for this industry, including an essential list of actions these businesses can take to help stop human trafficking.

36.     The Blue Campaign has produced lists of warning signs of human trafficking for members of the hospitality industry. The DHS remarked: "Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you

---

[18] G6 and the Motel 6 chain did not adopt The Code until 2019.  2020-g6hospitality.com/combating-human- trafficking: "G6 is committed to working with anti-trafficking and survivor services organizations. In 2019, G6 signed the ECPAT Tourism Child-Protection Code of Conduct (www.thecode.org), which is a joint venture of the tourism and hospitality sectors and ECPAT-USA (www.ecpatusa.org), a leader in advocacy and efforts to shape policy designed to end the commercial sexual exploitation of children."
[19] In January 2021, G6 Hospitality issued a press release:  "G6 Hospitality, parent company of the Motel 6 and Studio 6 brands, reaffirms its commitment to raising awareness about human trafficking and supporting the important work being done across industries to end human trafficking.  G6 Hospitality is deeply committed to doing our part to end human trafficking in all forms and to helping increase awareness about this global crime," said Rob Palleschi, CEO of G6 Hospitality. "Through enhanced training, continuous education, and ongoing partnerships and advocacy work, we remain committed to working with our franchise partners, the hospitality industry and other businesses to continue to combat human trafficking.  G6 Hospitality takes a proactive, zero-tolerance stance on human trafficking and the company is dedicated to ensuring the safety and well-being of our guests, our team members and the communities in which we operate."  g6hospitality.com/g6-hospitality-reaffirms-commitment-to-combating-human-trafficking
[20] https://www.dhs.gov/blue-campaign

access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims."[21]

37.     Government watchdogs, philanthropic organizations, and members of the hospitality industry and their consultants have identified well-known "red flags" that should alert the facility to the potential for sex trafficking taking place on the premises.  Sex trafficking "red flags" include the following:

a.     Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.

b.     Individuals show signs of physical abuse, restraint, and/or confinement.

c.     Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.

d.     Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.

e.     Individuals lack freedom of movement or are constantly monitored.

f.     Individuals avoid eye contact and interaction with others.

g.     Individuals have no control over or possession of money or ID.

h.     Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.

i.     Individuals have few or no personal items—such as no luggage or other bags.

j.     Individuals appear to be with a significantly older "boyfriend" or in the company of older males.

k.     A group of girls appears to be traveling with an older female or male.

l.     A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.[22]

---

[21] *Id; see also* Indicators of Human Trafficking, link at Indicators of Human Trafficking
[22] Blue Campaign.  One Voice.  One Mission.  End Human Suffering.  Hospitality Toolkit, link at Blue Campaign-Hospitality Toolkit

38.     The Blue Campaign also provides specific "signs of human trafficking for housekeeping, maintenance, and room service staff" at hotels and motels.  According to the Blue Campaign: "Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims."

39.      Specific "signs of human trafficking" for housekeeping, maintenance, and room service staff include:

a.    "Do Not Disturb" sign used constantly.

b.    Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.

c.    Refusal of cleaning services for multiple days.

d.    Excessive amounts of cash in a room.

e.    Smell of bodily fluids and musk.

f.    Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.

g.    The same person reserving multiple rooms.

h.    Individuals leaving room infrequently, not at all, or at odd hours.

i.    Children's items or clothing are present but no child registered with the room.

j.    Individuals loitering in hallways or appearing to monitor the area.

k.    Excessive amounts of alcohol or illegal drugs in rooms.

l.    Evidence of pornography.

m.    Minors left alone in room for long periods of time.

n.    Excessive number of people staying in a room.

o.    Extended stay with few or no personal possessions.

p.    Provocative clothing and shoes.

10

q.     Constant flow of men into a room at all hours.

r.     Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).

s.     Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.[23]

40.     There is a distinct list of "red flags" that pertain specifically to "concierge, bellman, front desk, security, and valet staff."  These employees are typically the first to see guests when they enter the motel.  When checking in or requesting motel amenities, a guest may exhibit behavior indicating human trafficking as follows:

t.     Patrons checking into room appear distressed or injured.

u.     The same person reserving multiple rooms.

v.     Few or no personal items when checking in.

w.     Room paid for with cash or pre-loaded credit card.

x.     Excessive use of hotel computers for adult oriented or sexually explicit websites.

y.     Patrons not forthcoming about full names, home address or vehicle information when registering.

z.     Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).

aa.     Patron appears with a minor that he or she did not come with originally.

bb.     Rentals of pornography when children are staying in the room.

cc.     Individuals dropped off at the hotel or visit repeatedly over a period of time.

dd.     Individuals leaving room infrequently, not at all, or at odd hours.

ee.     Minor with a patron late night or during school hours (and not on vacation).

ff.     Individuals checking into room have no identification.

gg.     Room is rented hourly, less than a day, or for long-term stay that does not appear

---

[23] *Id.*

normal.

hh.     Patrons request information or access to adult services or sex industry.

ii.     Room rented has fewer beds than patrons.

jj.     Individuals selling items to or begging from patrons or staff.

kk.     Individuals enter/exit through the side or rear entrances, instead of the lobby.

ll.     Car in parking lot regularly parked backward, so the license plate is not visible.

41.     There is yet a fourth category dedicated to providing signs of human trafficking for food and beverage staff, as follows:

mm.     Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.

nn.     Patron claims to be an adult although appearance suggests he/she is a minor.

oo.     Individuals loitering and soliciting male patrons.

pp.     Individuals waiting at a table or bar and picked up by a male (trafficker or customer).

qq.     Individuals asking staff or patrons for food or money.

rr.     Individuals taking cash or receipts left on tables.

42.     The above policies and warning signs are designed to reduce sex trafficking. These "red flags" compose the standard of corporate behavior in the hospitality industry and were known to industry long before 2012.

43.     Federal government agencies also publish extensive tools for responding to suspected sex trafficking. One compendium is the National Human Trafficking Resource Center "Identifying Victims of Human Trafficking – Fact Sheet."[24] This document acknowledges that responding to sex trafficking requires affirmative action: "It is important to be vigilant and to 'look beneath the surface'

---

[24] United States Department of Health and Human Services, Administration for Children and Families (ACF), Fact Sheet: Identifying Victims of Human Trafficking, link at Identifying Victims of Human Trafficking

in situations that don't seem quite right. One chance encounter could be a victim's best hope for rescue."[25]

44.     Indicators for potential exploitation or sexual abuse of minors have also been compiled by leading anti-trafficking groups such as the National Center for Missing & Exploited Children (NCMEC). The "red flags" for sexual exploitation include both behavioral indicators and physical signs of potential trafficking.[26]

45.     The Office of the Texas Attorney General sponsors guidelines and information on this subject, including a list of "Human Trafficking Red Flags."  This document enumerates some of the more prominent warning signs that should give rise to suspicion that an individual may be subject to coercion, force, or otherwise being held against their will.[27]

46.     The hotel and motel industry trade group, the American Hotel and Lodging Association, also advocates prudent anti-trafficking measures. Prior to the trafficking of Jane Doe (MA), the AHLA sponsored an industry statement condemning human trafficking:[28]

**AH&LA STATEMENT ON HUMAN TRAFFICKING**

The lodging industry condemns all forms of human trafficking, including that which has as its purpose the sexual exploitation of men, women or children.

U.S. laws on the state and federal level make such activity a crime and apply to all businesses and persons within their jurisdiction, including lodging. establishments. Moreover, lodging establishments are often subject to licensing requirements which prohibit the knowing use of their premises for illegal or immoral purposes. All employees are expected to comply and are encouraged to alert the authorities if there is suspected trafficking in their hotel.

---

[25] Link at Identifying Victims of Human Trafficking.  See generally Identifying Victims of Human Trafficking: What to Look for in a Healthcare Setting, link at Identifying Victims of Human Trafficking; U.S. Department of Health & Human Services, Office on Trafficking in Persons, LBS Public Awareness Materials, link at HHS-Identifying Victims of Human Trafficking

[26] NCMEC - The Issues: Child Sex Trafficking, link at https://www.missingkids.org/theissues/trafficking.  *See also* Polaris, National Human Trafficking Hotline, link at Recognizing the Signs; Love 146, How To Spot Red Flags If You're At Risk Of Trafficking And Exploitation, link at https://love146.org/red-flags/; Anti-Human Trafficking Intelligence Initiative, Red Flags and Indicators Applicable to Sex Trafficking and Forced Labor, link at Rd Flags and Indicators; Truckers Against Trafficking, Human Trafficking Red Flags, link at Red Flags

Texas Attorney General, Human Trafficking Red Flags, link at  Texas Attorney General, Human Trafficking Red Flags

[27] Texas Attorney General, Human Trafficking Red Flags, link at  Texas Attorney General, Human Trafficking Red Flags

[28] 2011-AHLA Statement on Human Trafficking.  See generally the AHLA Statement on Security, link at 2011- AHLA Statement on Security

47.     The Department of Homeland Security urges businesses – such as the Motel 6 chain– to utilize the free educational services offered by the Blue Campaign to help "identify victims of human trafficking by raising general awareness and encouraging the public to report suspected instances of human trafficking."[29]

48.     Hence, prior to the trafficking of Jane Doe (MH) in 2012, there were reliable, established industry standards for combatting human trafficking.  The hospitality industry in general, and G6 in particular, knew of the need to adopt and enforce meaningful anti-trafficking policies and procedures.

49.     It is widely recognized that effective training has a substantial, positive impact on the prevalence and scope of trafficking.[30]  According to the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[31]

50.     Thus, when hotels and motels implement viable anti-trafficking measures, provide proper training, and enforce anti-trafficking policies, trafficking is less likely to occur, and victims are more likely to be rescued.[32]

51.     Conversely, when training is not provided and when anti-trafficking policies are not enforced, these insidious criminal ventures will flourish. Motivation for profits is the precursor upon which traffickers depend to ply their trade.

---

[29] 2012-One DHS-The Blue Campaign
[30] United States Department of Homeland Security – Blue Campaign, Hospitality Tool Kit, link at Hospitality Toolkit; *see generally* Roman, Emily, "Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking" (2019). Digital Commons @ ACU, Electronic Theses and Dissertations.  Paper 152, link at Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking
[31] American Hotel Lodging Association, No Room For Trafficking, link at AHLA-Human Trafficking
[32] ECPAT reports that, of hotel employees who receive training on sex trafficking, 84% have increased awareness of these events compared with 16% of untrained employees.  See  ECPATUSA-No Vacancy.  See also Sex Trafficking in the Tourism Industry, J. Tourism Hospit. 2015, link at Sex Trafficking in the Tourism Industry; Roman, Emily, "Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking" (2019). Digital Commons @ ACU, Electronic Theses and Dissertations. Paper 152, link at Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking

52.     To be truly effective, human trafficking training should be part of an ongoing education and communication program to provide hotel staff with the knowledge and support they environment for all staff and guests.[33]

53.     The foregoing discussion establishes there are long-standing, well-known, viable standards of conduct and corporate operations available to G6 chain to combat sex trafficking. These guidelines were known to members of the hospitality industry in 2012 at the time Jane Doe (MH) was trafficked at the Phoenix Motel 6. Contemporaneously, G6 continued to do business with the traffickers who victimized Jane Doe (MH) and profited from that venture. Thus, the G6 Defendants are liable for a violation of the federal anti-trafficking statute.

## VIII.     Allegations Specific to the G6-Motel 6 Defendants

54.     The Motel 6 motel chain is owned and operated by G6 Hospitality, which has its headquarters in Carrollton, Texas.

55.     The specific motel at which Jane Doe (MH) was trafficked is a company owned facility. While many hotels and motels are now operated pursuant to franchise agreements, such is not the case with regard to the Motel 6 located at 2330 West Bell Road, Phoenix, Arizona. G6 Hospitality and its affiliates had direct control over this facility, responsibility for its operations, and corporate knowledge of events that occurred at the Phoenix Motel 6.

56.     The Phoenix Motel 6 is an alter ego, representative, agent, or co-conspirator of Defendant G6, its owner and parent corporation.  Defendant G6 exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Phoenix Motel 6.

57.     Defendant G6 and the Phoenix Motel 6 are a single and joint employer with a high

---

[33] Five Ways Human Trafficking Training Can Help Hotels Increase Awareness and Prevention (2020), link at Five Ways Human Trafficking Training Can Help Hotels Increase Awareness and Prevention

degree of interrelated, intermingled, and unified operations at the Phoenix Motel 6 where the Plaintiff was trafficked for money. Defendants G6 and Motel 6 Phoenix each share the common policies and practices complained of herein.

58.     Defendant G6 and Motel 6 Phoenix jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

59.     As an integrated enterprise and or joint employer, Defendant G6 and Motel 6 Phoenix are separately and jointly responsible for compliance with all applicable laws.

60.      As an integrated enterprise and or joint employer, Defendant G6 and the Motel 6 Phoenix are jointly and severally liable for any damages caused by employees.

61.      The G6 Defendants have consistently signified that they have taken timely and prudent steps to adopt, maintain, and enforce policies to ensure the highest level of quality and service, respect, trust, customer service, ethical behavior, accountability, and integrity. This representation is demonstrably false as more fully elucidated in this Complaint.

62.     Among the largest and most popular motel chains, Motel 6 is noteworthy for failing to adopt in a timely manner and abide by industry standards and instead has earned the opprobrium of society for its lackadaisical historical attitude about sex trafficking occurring at its motels.

63.     Countless tales of tragedy establish the entrenched, pervasive nature and knowledge of Motel 6's role as the preferred venue for sex trafficking across the Unites States:

    a.  In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[34]

    b.  In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[35]

    c.  In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[36]

---

[34] Amy Fine Collins, *Sex Trafficking of Americans:   The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.
[35] Five Toledoans           Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.
[36] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010),

    d.    From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[37]

    e.    Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[38]

64.    These news stories establish that the Motel 6 Defendants knew, or should have known, that sex trafficking was a problem at its motels, including the Phoenix Motel 6 at which Jane Doe (MH) was trafficked in 2012. Thus, G6 had notice of the urgency of adopting and implementing effective anti-sex trafficking measures long before Jane Doe (MH) was victimized.

65.    Again, there are well-established standards of corporate operations that are applicable to members of the hospitality industry and that describe effective measure that may be utilized to prevent or minimize human trafficking.

66.    G6 failed to adopt, implement, and enforce standards and codes of conduct designed to prevent sex trafficking at their motels. G6 had no programs in place as of 2012 for the protection of victims such as Jane Doe (MH).[39]  Instead, G6 continued to focus on business as usual by renting rooms and making profits, all the while permitting traffickers to conduct business while G6 and its employees knew or should have known the business underway was the trafficking of humans, including Jane Doe (MH).

67.    Thus, the evidence in the case at bar will show that the Defendants breached a solemn responsibility and knowingly benefitted from participation in a venture that Defendants knew or should have known was engaged in trafficking.

---

https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[37] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[38] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[39] G6 and Motel 6 did not offer corporate and field team members any training on anti-trafficking until the fourth quarter of 2018.  AHLA Statement  As of today, this training is mandatory.  Human Trafficking Training Across 1500 Properties

68.     The direct result of the foregoing failures was that Jane Doe (MH) was subjected to horrendous trafficking behavior at the Phoenix Motel 6 from June to August 2012. The harm to Jane Doe (MH) more likely than not would have been eliminated or minimized if proper operating standards and policies were in place at the Phoenix Motel 6.

## IX.     Jane Doe (MH)

69.     In mid-2012, Jane Doe (MH) was forcibly taken to the Motel 6 located at 2330 West Bell Road, Phoenix, Arizona. This is a company-owned and operated location.

70.     During the months of June, July, and August 2012, Jane Doe (MH) was forced to engage in commercial sex acts, was subjected to coercion, and suffered serious harm at the hands of her traffickers.

71.     The criminal acts perpetrated on Jane Doe (MH) violated the federal anti-trafficking laws, as more fully explained throughout this Complaint.

72.     Jane Doe (MH) was present at the Phoenix Motel 6 for lengthy periods of time during June-August 2012. Jane Doe (MH) was a "person" who was recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited by other "persons."

73.     G6 provided the location for Jane Doe (MH) to be trafficked.

74.     Contemporaneously, Doe (MH) was subjected to force, threats of force, fraud, coercion, or any combination of such means that caused her to engage in commercial sex acts while at the Phoenix Motel 6.

75.     During the time period from June 2012 to August 2012, there were abundant "red flags" that alerted Defendant G6 that Jane Doe (MH) was being trafficked.

76.     During the time period from June 2012 to August 2012, there were abundant "red flags" that alerted Defendant G6 that Jane Doe (MH) was being trafficked.  Among others, the following indicators of sex trafficking occurred in connection with Jane Doe (MH)'s trafficking:

a.   Jane Doe (MH) and/or other victims showed signs of fear, anxiety, tension, submission, and/or nervousness with this behavior taking place in the presence of Motel 6 personnel.

b.   Jane Doe (MH) and/or other victims showed signs of physical abuse, restraint, and/or confinement, all of which were evident to Motel 6 personnel.

c.   Jane Doe (MH) had visible bruising of her face and arms while in the presence of Motel 6 personnel.

d.   Jane Doe (MH) and/or other victims showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior while in the presence of Motel 6 personnel.

e.   Jane Doe (MH) lacked freedom of movement or was constantly monitored, which conduct occurred while in the presence of Motel 6 personnel.

f.   Jane Doe (MH) dressed inappropriately for her age or had lower quality clothing compared to others in her party, which was seen by Motel 6 personnel.

g.   Jane Doe (MH) appeared with a significantly older "boyfriend" or in the company of older males while in the presence of Motel 6 personnel.

h.   Jane Doe (MH) was part of a group of girls who appeared to be traveling with an older female or male, with this conduct taking place in the presence of Motel 6 personnel.

i.   Jane Doe (MH) appeared distressed or injured while in the presence of Motel 6 personnel.

j.   The same person that accompanied Jane Doe (MH) reserved multiple rooms, with these transactions being conducted with the assistance, support, and facilitation of Motel 6 personnel.

k.   The rooms at the subject Motel 6 were paid for with cash or a pre-loaded credit card with these transactions being conducted with the assistance, support, and facilitation of Motel 6 personnel.

l.   One or more patrons who accompanied Jane Doe (MH) was not forthcoming about their full names, home addresses, or vehicle information when registering, with this conduct taking place in the presence of Motel 6 personnel.

m.   Jane Doe (MH) and/or her traffickers appeared in the presence of Motel 6 staff with a minor that did not come to the motel originally, with this conduct taking place in the presence of Motel 6 personnel.

n.   Individuals were dropped off at the subject Motel 6 or visited the facility repeatedly over a period of time, with this conduct taking place in the presence of Motel 6 personnel.

o.   There were individuals leaving the room in which Jane Doe (MH) was held infrequently, not at all, or at odd hours, with this conduct taking place in the presence of Motel 6

personnel.

p. Jane Doe (MH) and/or one or more individuals who checked in with Jane Doe (MH) had no identification, with this conduct taking place in the presence of Motel 6 personnel.

q. The room(s) in which Jane Doe (MH) was held were rented hourly, less than a day, or for long term stays that did not appear normal with these transactions being conducted with the assistance, support, and facilitation of Motel 6 personnel.

r. The room(s) in which Jane Doe (MH) was held had fewer beds than patrons, with this conduct being known to Motel 6 personnel.

s. Individuals entered and exited the subject Motel 6 through the side entrance or rear entrances instead of the lobby with this conduct taking place in the presence of Motel 6 personnel.

t. Cars in the Motel 6 parking lot regularly parked backwards so the license plates were not visible, with this conduct taking place in the presence of Motel 6 personnel.

u. The "Do Not Disturb" sign was used constantly, with this conduct taking place in the presence of Motel 6 personnel.

v. Jane Doe (MH)'s traffickers requested room or housekeeping services (additional towels, new linens, etc.), but denied motel personnel entry into the room, with this conduct taking place in the presence of Motel 6 personnel.

w. Motel staff cleaning services were refused for multiple days, with this conduct taking place in the presence of Motel 6 personnel.

x. There were excessive amounts of cash in the room that was visible from the public hallway, with this conduct taking place in the presence of Motel 6 personnel.

y. The room(s) in which Jane Doe (MH) was held smelled of body fluids and musk, which was evident from the public hallway, with this conduct taking place in the presence of Motel 6 personnel.

z. The room(s) in which Jane Doe (MH) was held contained multiple computers, cell phones, pagers, credit card swipes, or other technology, which was visible from the public hallway, with this conduct taking place in the presence of Motel 6 personnel.

aa. There were individuals loitering in the hallways or appearing to monitor the area in the vicinity of the room(s) in which Jane Doe (MH) was held, with this conduct taking place in the presence of Motel 6 personnel.

bb. There were excessive amounts of alcohol or drugs in the room(s) in which Jane Doe (MH) was held, which was visible from the public hallway, with this conduct taking place in the presence of Motel 6 personnel.

cc. Minors were left alone in the room(s) in which Jane Doe (MH) was held for varying

periods of time, with this conduct taking place in the presence of Motel 6 personnel.

dd. There were excessive amounts of alcohol or drugs in the room(s) in which Jane Doe (MH) was held, which was visible from the public hallway, with this conduct taking place in the presence of Motel 6 personnel.

ee. Minors were left alone in the room(s) in which Jane Doe (MH) was held for varying periods of time, with this conduct taking place in the presence of Motel 6 personnel.

ff. There was an excessive number of people staying in the room(s) in which Jane Doe (MH) was held, with this conduct taking place in the presence of Motel 6 personnel.

gg. Jane Doe (MH) was subjected to extended stays at the Phoenix Motel 6 with few or no personal possessions, with this conduct taking place in the presence of Motel 6 personnel.

hh. Jane Doe (MH) appeared in provocative clothing and/or shoes, which was seen by Motel 6 personnel.

ii. There was a constant flow of men into the room(s) in which Jane Doe (MH) was held, with this conduct taking place in the presence of Motel 6 personnel.

jj. There was an excessive amount of sex paraphernalia in the room(s) in which Jane Doe (MH) was held, including condoms, all of which was visible from the public hallway, with this conduct taking place in the presence of Motel 6 personnel.

kk. One or more of the traffickers actively solicited male patrons at the Phoenix Motel 6 during the time period Jane Doe (MH) was held there, all of which was visible to and seen by Motel 6 personnel; and

ll. Jane Doe (MH) and other trafficking victims were forced to wait at tables or lounges in the public areas of the Motel 6 to be picked up by traffickers or customers with whom Jane Doe (MH) was forced to engage in commercial sex. These events took place in the presence of Motel 6 personnel on multiple occasions.

Based on the foregoing, Jane Doe (MH) contends that the collective Defendants had knowledge of facts that trafficking was occurring at the Phoenix Motel 6 in June through August of 2012; Motel 6 personnel knowingly assisted, supported, and facilitated the criminal activity of Jane Doe (MH)'s traffickers.

77.    On information and belief, Motel 6 benefitted financially and otherwise from its participation in the venture that trafficked Jane Doe (MH) in ways ranging from securing profits from the rental of rooms and other on-site sales on one hand and to enhancing profits from the collection, sale and/or manipulation of customer data on the other. Additionally, G6's

brand/goodwill is of significant importance to G6 as evidenced by the fact that G6 touts its unwavering commitment to brand positioning.[40]Brand/goodwill is generally understood to mean the advantages that accrue to a business on account of its name, location, reputation, and success. Although it is intangible, it is an integral part of a business. [41] By participating in the venture that trafficked Jane Doe (MH), which participation included not reporting, minimizing and generally ignoring trafficking at the Motel 6, G6 was able to maintain and enhance its brand/goodwill, which it clearly considered a financial benefit.

78.    G6/Motel 6 participated in a trafficking venture and knowingly benefitted from that participation. Hence, all Defendants are guilty of violating the federal anti- trafficking laws.

79.    Jane Doe (MH) suffered immediate, permanent, and substantial harm as a result of the atrocities committed against her. She suffered personal injuries and physical harm as well as mental anguish, emotional trauma, and psychological abuse, all of which is the responsibility of Defendants and their criminal venturers. Jane Doe (MH) will, in all likelihood, continue to suffer from these traumas for the remainder of her life.

### IX.    <u>Cause of Action</u>
### VIOLATION OF THE TVPRA

80.    Jane Doe (MH) incorporates all other allegations in supplementation of the cause of action alleged as relevant and applicable.

81.    The civil remedy provision of the federal human trafficking statute is found at 28 U.S.C. § 1595:

---

[40] "The first Motel 6 opened in Santa Barbara, CA, in June 1962 and has been in continuous operation ever since. More than fifty years later, Motel 6 has become synonymous with the economy lodging segment and is currently the largest owner/operator/franchisor in the U.S. economy lodging segment with more than 1,400 motels operating in 49 states and five Canadian provinces. The brand's assets are strategically located throughout the U.S. — close to airports, freeways and other thoroughfares. Motel 6 is supported by an experienced brand management team and a best-in-class operating platform, each committed to protecting the brand's core business strategy — providing a clean, comfortable room and great service. The consistent, unwavering commitment to this brand positioning has successfully established Motel 6 as an iconic American brand." Link at https://g6hospitality.com/our-brands/
[41] See *Orbison v. Ma-Tex Rope Co.,* Inc., 553 S.W.3d 17, 29 (Tex. App.—Texarkana 2018, pet. denied) (citations omitted).

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

82.     The Defendants knowingly benefited from participating in a venture which they knew or should have known was engaged in illegal sex trafficking in violation of the TVPRA, 18 U.S.C. § 1591(a)(2) by, *inter alia*, engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of the Plaintiff for commercial sexual exploitation.  Defendants knew that their repeated failures to address known risks of human trafficking on their motel properties would increase the overall volume of illegal commercial sexual exploitation and  victimization at their  motel properties. Defendants knowingly benefited from facilitating the trafficking of persons on the motel properties. Jane Doe (MH) sustained irreparable harm as a result of these violations.

83.     First, Defendants knowingly benefitted, by receiving financial and other things of value, through their participation in the venture that trafficked Jane Doe (MH) at the Phoenix Motel 6.

84.     G6 received substantial financial and other benefits from Jane Doe (MH)'s traffickers including, but not limited to, motel room rental fees, fees other than for room rentals, collection and sale of personal data, food and beverage sales, and other ancillary fees and/or sales from the operation of the subject hotel. The Phoenix Motel 6 benefitted financially from the presence of Jane Doe (MH)'s sex traffickers using the Motel 6 facilities.

85.     Second, Defendants were participants in a venture that ultimately trafficked Jane Doe (MH). The federal sex trafficking statute defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity."  18 U.S.C. § 1591(e)(6). The Phoenix Motel 6 and its employees were associated in fact with Jane Doe (MH)'s traffickers during the months of June, July, and August 2012.

86.     As provided by the federal anti-trafficking statute, "participation in a venture" means "knowingly assisting, supporting, or facilitating a violation of" section 1591. Plaintiff alleges that G6 and the employees at the Phoenix Motel 6 assisted, supported, and facilitated a venture that resulted in her trafficking as more fully outlined in this pleading.

87.     The venture between G6 and Jane Doe (MH)'s traffickers was an undertaking or enterprise involving risk and potential profit – risk due to the criminal nature of the conduct taking place at the Phoenix Motel 6 and profits flowing from the use of the motel by the venture.

88.     G6 took affirmative, overt actions in furtherance of the venture by continually renting rooms to Jane Doe (MH)'s traffickers, providing motel services to the venture, shielding the traffickers from detection, accommodating requests by the traffickers when the requests should have alerted on-site staff of ongoing trafficking, and failing to adopt and enforce reasonable and prudent anti-trafficking policies, all the while ignoring the obvious signs of Jane Doe (MH)'s trafficking.

89.     Thus, it is alleged and will be shown at trial that Defendants did knowingly assist, support, or facilitate a violation of the federal human trafficking statute, 18 U.S.C. § 1591 (a)(1), by Jane Doe (MH)'s traffickers.

90.     The criminals who trafficked Jane Doe (MH) violated 18 U.S.C. § 1591. Thus, Plaintiff alleges that the venture consisting of G6, and the criminal traffickers violated the federal criminal sex trafficking statute, which gives rise to civil liability as to all participants in this venture– including G6.

91.     Third, Defendants, including the personnel who worked at the Phoenix Motel 6, knew or should have known that trafficking was occurring on their property.

92.     Prior to the summer of 2012, G6 and its employees at the Phoenix Motel 6 knew that human trafficking took place at Motel 6 facilities across the Nation and specifically at the Phoenix Motel 6.

93.     Unfortunately, G6 and the Phoenix Motel 6 took no steps, had no policies, and enforced no requirements for combating human trafficking.  G6 failed to educate its employees or adopt and enforce any meaningful anti-trafficking polices despite the fact that these actions were customary and essential in the hospitality industry for the protection of patrons and guests.

94.     The Motel 6 Defendants took no action to address the risk of trafficking at the Phoenix Motel 6 and instead made their property available to the venture that subdued and trafficked Jane Doe (MH).  Thus, both Defendants and the criminal traffickers shared a common purpose: making money. The Motel 6 Defendants profited while Jane Doe (MH)'s traffickers were able to rent rooms in which they forced Jane Doe (MH) to engage in commercial sex.

95.     During the summer of 2012, there was a continuous business relationship between the traffickers and the Phoenix Motel 6 such that it would appear that the traffickers and the motel had established a pattern of conduct or could be said to have a tacit agreement, thereby establishing constructive knowledge on the part of G6 that trafficking was ongoing at the Phoenix Motel 6.

96.     It is alleged, therefore, that G6 had notice of a venture that ultimately trafficked Jane Doe (MH). Thus, Defendants are guilty of "participation in a venture" as that terminology is employed in the TVPRA.

97.     A corporation like G6 cannot escape the reach of the federal anti-trafficking statutes "by deliberately shielding themselves from clear evidence of critical facts" that human trafficking is occurring at their facility.  "Defendants who behave in this manner are just as culpable as those who

have actual knowledge."[42]

98.    It is the independent conduct of G6 in knowingly assisting, supporting, and facilitating the venture that trafficked Jane Doe (MH) that gives rise to liability under section 1595.

99.    The conduct of the Motel 6 Defendants and their violations of the Trafficking Victims Protection Act and its reauthorization amendments were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (MH).

## X.    <u>Joint and Several Liability</u>

100.    "A creature of tort law, joint and several liability 'applies when there has been a judgment against multiple defendants.'"[43]  If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount.[44]

101.    Under traditional tort law, a plaintiff obtaining a judgment against more than one concurrent tortfeasor may satisfy it against any one of them. A concurrent tortfeasor generally may seek contribution from another, but he is not relieved from liability for the entire damages.[45]

102.    Thus, Plaintiff alleges that, under federal law, the Defendants are jointly and severally liable, and none of the tortfeasors are relieved from liability simply because another tortfeasor also committed liability-causing actions, nor are the damages against a tortfeasor diminished to its proportion of fault.[46]

103.    Plaintiff alleges that Defendants acted intentionally and knowingly in their participation in the venture that held Jane Doe (MH), which compels the application of joint and

---

[42] Honeycutt v. United States, 137 S, Ct. 1626 (2017), quoting *McDermott, Inc.* v. *AmClyde*, 511 U. S. 202, 220–221 (1994).
[43] See Restatement (Second) of Torts §875 (1977)." *Honeycutt v. United States*, 581 U. S. _____,  137  S.  Ct.  1626 (2017).
[44] *See generally Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S. Ct. 2753, 61 L. Ed. 2d 521 (1979).
[45] *See generally Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S. Ct. 2753, 61 L. Ed. 2d 521 (1979).
[46] *See generally Manganiello v. City of New York,* No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

several liability.

104.    Hence, it should follow that all tortfeasors who are found guilty of trafficking Jane Doe (MH) should likewise be required to produce evidence upon which to base an allocation of damages sustained by a trafficking victim.

## XI.    **Damages**

105.    Jane Doe (MH) incorporates all other allegations in supplementation of the cause of action alleged as relevant and applicable.

106.    Plaintiff prays for all damages recoverable under the law including actual damages: physical pain, mental anguish, disfigurement, physical impairment, medical expenses, loss of earnings and earning capacity, loss of consortium, and loss of services.

107.    Plaintiff seeks the award of exemplary damages against Defendants as recoverable under federal law.

108.    Plaintiff also seeks recovery of costs of court and attorneys' fees to the extent permissible under federal law.

109.    Plaintiff also requests that the Court award pre-judgment and post-judgment interest in accordance with the prevailing rates of interest under federal law.

## XII.    **Jury Demand**

110.    In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby make application for a jury trial and requests that this cause be set on the Court's Jury Docket.  In support of their application, the appropriate jury fee has been paid to the clerk.

## XIII.    **Prayer**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause judgment be entered for Plaintiff against Defendants jointly and severally, for the actual, compensatory, and punitive damages as the

evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on counsel of record pursuant to the Federal Rules of Civil Procedure on April 25, 2022.

Respectfully submitted,



By:     /s/ Kenneth T. Fibich
        Kenneth T. Fibich
        Texas Bar No.: 06952600
        tfibich@fibichlaw.com
        Sara J. Fendia
        Texas Bar No. 06898800
        sfendia@fibichlaw.com
        Jay Henderson
        Texas Bar No. 09424050
        jhenderson@fibichlaw.com
        1150 Bissonnet Street
        Houston, Texas 77005
        713-751-0025 (Telephone)
        713-751-0030 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**